UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CONGRESSIONAL HUNGER CENTER<br>Hall of States Building<br>400 N. Capitol St. NW Ste. G100<br>Washington, D.C. 20001<br>                           Plaintiff,<br>v.<br><br>MOHAMED H. GUREY<br>2038 Columbia Pike Apt. 2<br>Arlington, VA 22204<br><br>                           Defendant. | Civil Action No. 17-cv-2356<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Congressional Hunger Center ("Plaintiff" or "CHC"), by and through undersigned counsel, brings this action for money damages against Defendant Mohamed H. Gurey ("Defendant" or "Gurey") to recover for breach of fiduciary duty, conversion, and fraud. This action arises out of an embezzlement scheme perpetrated against CHC by Gurey, a former CHC employee who abused his position as CHC's Director of Finance to misappropriate in excess of $1,100,000 of CHC funds for his personal benefit.

In support of its Complaint, Plaintiff pleads as follows:

## JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a), as the parties are diverse and the amount in controversy exceeds $75,000. CHC is incorporated in the District of Columbia, and its principal place of business is in the District of Columbia. Upon information and belief, Gurey is a citizen of Ethiopia and a resident of Virginia.

2. This Court has personal jurisdiction over Gurey because he transacted business within the District of Columbia and caused tortious injury by actions taken within the District of Columbia, and the claims filed herein arise out of such actions.

3. Venue is proper in this Court because all or a substantial portion of the events giving rise to CHC's claims occurred within the District of Columbia.

## PARTIES

4. CHC is a not-for-profit corporation organized for charitable and educational purposes within the meaning of § 501(c)(3) of the Internal Revenue Code. Its principal place of business is located at 400 North Capitol Street NW, Suite G100, Washington, D.C. 20001.

5. CHC employed Gurey from approximately January 2001 until December 8, 2016, most recently as its Director of Finance. Upon information and belief, Gurey is a citizen of Ethiopia and his residence is 2038 Columbia Pike, Apt. # 2, Arlington, Virginia 22204.

## CHC'S HISTORY AND PURPOSE

6. CHC's story begins in 1983, when former Congressmen Benjamin Gilman, Mickey Leland, and Tony Hall formed the Select Committee on Hunger in the United States House of Representatives. The Select Committee was organized to advise the House of Representatives on ways to address hunger issues and malnutrition in the United States and around the globe. After the House of Representatives allowed the Select Committee to expire in 1993, Congressman Hall began a three-week fast to protest its expiration.

7. The Congressman's protest galvanized interest in the creation of a bi-partisan, non-profit organization focused on addressing domestic and international hunger issues. To that end, Congressman Hall established CHC in 1993. Congressman Bill Emerson along with Congressman Hall served as the first co-chairs of the bi-partisan, non-profit organization.

8.      Since its founding, CHC has organized and hosted numerous workshops, national and international hunger forums, and briefings for members of Congress and policy-makers. The organization also sponsors two fellowships for individuals interested in gaining the experience to become effective anti-hunger advocates: the Bill Emerson National Hunger Fellows Program and the Mickey Leland International Hunger Fellows Program.

9.      The Bill Emerson National Hunger Fellows Program (the "Emerson Fellowship") connects Emerson Fellows with community-based organizations throughout the United States, including food banks, community kitchens, and local advocacy agencies. After spending six months with such community-based organizations, Emerson Fellows then spend an additional six months working with a range of policy-focused organizations in Washington, D.C.

10.     The Mickey Leland International Hunger Fellows Program (the "Leland Fellowship") focuses on international rather than domestic hunger issues. The Leland Fellowship begins with a year-long placement at an organization in a developing country. Leland Fellows then work for a year in global policy organizations such as the United Nation's food agency headquarters in Rome, Italy, or policy-based organizations in Washington, D.C.

11.     From 1994 through 1999, CHC supported the Emerson Fellowship with a federal grant provided by AmeriCorps VISTA, a national service program.

12.     From 2000 to today, CHC has funded both fellowships with a yearly appropriation from the United States Department of Agriculture ("USDA").

13.     Today, the operations of CHC are overseen by an Executive Director, Chief Operating Officer, and several fellowship program managers. A Board of Directors ("the Board") governs the operations of CHC, and includes members of Congress, domestic and international hunger advocates, former fellows, and industry partners.

## GUREY'S EMPLOYMENT HISTORY WITH CHC: 2001-2015

14. In January 2001, CHC hired Gurey as an independent contractor to assist the company in managing its accounting functions. CHC later hired Gurey on a full-time basis as its Director of Finance. Gurey served in this position for approximately fourteen years.

15. Gurey's responsibilities included preparing CHC's yearly budget as well as monthly and quarterly financial statements, monitoring payroll, overseeing CHC's cash disbursements, and preparing financial statements and reports for CHC's yearly audit.

16. For CHC's yearly audit, Gurey prepared supporting schedules, financial statements, and other relevant audit documentation for CHC's external auditors. Gurey also provided the auditors with access to CHC's financial records. From 2001 through 2015, the external auditors consistently issued unqualified opinions for CHC's financial statements.

17. Gurey also routinely provided information about CHC's monetary accounts and overall financial health to CHC's Executive Director, who in turn would use such information in presentations and documents prepared for the Board. The Board relied upon this information when making decisions about the organization's spending priorities and budget.

18. During the course of his employment, Gurey reported primarily to Ms. Margaret Zeigler ("Ms. Zeigler"), the former Deputy Director at CHC who left in 2012.

19. After Ms. Zeigler's departure, CHC eliminated the Deputy Director position and delegated her job responsibilities to other members of the CHC staff. The responsibility of overseeing Gurey's accounting work was assigned to CHC's Executive Director. At this time, Mr. Edward Cooney ("Mr. Cooney") was CHC's Executive Director. Mr. Cooney served in that role from February 2001 to September 2015. In September 2015, Ms. Shannon Maynard ("Ms. Maynard") succeeded Mr. Cooney as CHC's Executive Director.

## GUREY'S PERFORMANCE ISSUES: 2015-2016

20. Shortly after joining CHC in September 2015, Ms. Maynard set out to finalize CHC's budget for the 2016-2017 fiscal year. Because of an expected decrease in revenue for that year, Ms. Maynard sought to identify cost-saving measures to lower CHC's expenses.

21. To that end, in April 2016, Ms. Maynard eliminated the position of Payroll & Benefits Coordinator and outsourced some financial and personnel duties to an outside vendor.

22. Gurey, however, vocally opposed outsourcing any of CHC's payroll functions, claiming that he could perform the duties at no additional cost to CHC. Because of his opposition, Ms. Maynard allowed Gurey to handle CHC's payroll functions.

23. Ms. Maynard subsequently went on maternity leave in June 2016. While on leave, Chief Operating Officer Kristin Anderson ("Ms. Anderson") was named CHC's Acting Executive Director. Throughout this time period, Gurey reported to the Acting Executive Director on a daily basis. Gurey also directly interacted with the Board's Treasurer, Mr. Wolfgang von Maack, on issues related to CHC's annual budget and financial reports.

24. Ms. Maynard returned from maternity leave in September 2016, after which she observed a number of performance-related issues with Gurey, including lack of adherence to deadlines, communication difficulties, and repeated unexplained absences from work.

25. As of this time, Gurey was also integrally involved in preparing CHC for its yearly audit, which was scheduled to take place in November 2016.

26. On November 2, 2016, Ms. Maynard met with Gurey to discuss his progress with preparing the necessary financial paperwork for its yearly audit. During the meeting, however, Gurey informed Ms. Maynard that he had not yet completed the paperwork. Gurey also requested seventeen days of paid time off for November 2016. Gurey informed Ms.

Maynard that he needed the time to complete certain accounting-related education courses as required to maintain his Certified Public Accountant professional license.

27. Following the November 2, 2016 meeting, Ms. Maynard rescheduled CHC's yearly audit for the second week of December 2016.

28. Ms. Maynard also denied Gurey's request for leave because of its timing in relation to the yearly audit, as well as a lack of advance notice.

29. Gurey then attempted to circumvent Ms. Maynard by calling the Board Treasurer, Mr. Wolfgang von Maack, to seek his permission to take the time off. Gurey did not receive approval for this request.

30. On November 10, 2016, Ms. Maynard met with Gurey for his annual performance review. Ms. Maynard rated his performance as "needs improvement," the lowest rating available. Ms. Maynard's evaluation also identified several areas of improvement, which included the timeliness of his quarterly and monthly financial reporting.

31. On November 14, 2016, Ms. Maynard provided Gurey with a "Warning and Performance Improvement Plan", which reflected the same areas of deficiency identified in Gurey's annual performance review. It also contained a list of key tasks, deliverables expected from those tasks, as well as the deadlines for those deliverables. Thereafter, Ms. Maynard met with Gurey on a weekly basis to monitor Gurey's progress.

32. On Wednesday, December 7, 2016, Gurey did not report for work. Nor did Gurey provide any notice to anyone at CHC indicating he would be absent.

33. Later that afternoon, Ms. Maynard discovered a letter in her CHC mailbox written by Gurey. The letter "requested" that he be allowed to take vacation from December 7-

15, 2016, despite the fact that Ms. Maynard denied his previous request for leave. Gurey's letter stated that he planned to return on December 16, 2016, to assist with CHC's annual audit.

34. In light of the foregoing issues, Ms. Maynard consulted with a Human Resources firm about terminating Gurey. She was prepared to notify Gurey on Thursday, December 8, 2016, that he was terminated effective immediately for job abandonment.

### **DISCOVERY OF EMBEZZLEMENT SCHEME**

35. Just prior to formally terminating Gurey, Ms. Maynard logged in to CHC's online banking portal with Bank of America to de-activate his access to CHC's bank accounts.

36. She immediately noticed that the balance for CHC's accounts was dramatically lower than the cash-on-hand reflected in financial statements provided by Gurey during November 2016. Specifically, Ms. Maynard had informed the Board that, as of November 23, 2016, CHC had $715,252 in funds based on information Gurey provided. In reality, as of December 8, 2016, CHC had only $137,526 available, which was approximately sixty-eight percent (68%) of the amount necessary to cover December expenses, including the next payroll.

37. Ms. Maynard then reviewed the records of all transactions conducted from the Bank of America accounts from 2015 to 2016. During her review, she noticed a number of suspicious checks written to Gurey for amounts well in excess of $1,000.

38. Because these checks were written for amounts in excess of $1,000, CHC's accounting procedures required that they contain the signatures of Ms. Anderson and Gurey, or Ms. Anderson and Ms. Maynard.

39. The suspicious checks contained what appeared to be the forged signature of Ms. Anderson, as well as the genuine signature of Gurey.

40. Ms. Maynard also noticed that Ms. Anderson ostensibly signed these checks when she was out of the office on medical leave.

41. Ms. Maynard conferred with Ms. Anderson and confirmed that she neither signed off on the checks nor provided Gurey with authorization to do so on her behalf.

42. In addition to the checks, Ms. Maynard discovered that, during 2016, Gurey routinely made large, unapproved cash withdrawals at a local Maryland casino.

43. Ms. Maynard notified CHC's Bank of America representative regarding the fraudulent nature of these transactions. She also removed Gurey's online and telephonic access to the Bank of America accounts, as well as to CHC's online financial management software. Finally, she arranged for building management and security to disable Gurey's access to CHC's office.

44. On the afternoon of December 8, 2016, Ms. Maynard mailed a letter to Gurey's address, notifying him that CHC terminated his employment for gross misconduct.

45. No CHC employee has seen or spoken to Gurey since December 8, 2016.

## INJURIES SUFFERED BY CHC

46. With the help of an outside accounting firm, CHC has determined that, since 2010, Gurey stole in excess of $1,100,000 through the schemes described above.

47. In 2016 alone, Gurey's unauthorized disbursements totaled approximately $600,000.

48. Gurey's schemes also interfered with CHC's ability to comply with the terms of a loan agreement that it entered in 2016 with the Nonprofit Finance Fund ("NFF"), a company that offers loans and other financial services to nonprofit organizations.

49.     Specifically, in January 2016, CHC entered into an agreement with NFF for a line of credit ("LOC") for $500,000.  In anticipation of potentially not receiving its $2,000,000 yearly appropriation from the USDA until May 2017, CHC had drawn the full amount of the LOC to fund its operations until Congress could pass a formal budget.

50.     CHC agreed to pay back the LOC in its entirety, including the principal and accrued interest, on February 1, 2017 (the "Maturity Date").

51.     Because of the amount that Gurey withdrew from CHC's accounts, Ms. Maynard recognized that CHC would be unable to repay the LOC on its Maturity Date.

52.     CHC has since renegotiated the terms of its agreement with NFF, resulting in significant reputational harm.  CHC will also pay an amount of interest that exceeds the amount it would have paid had its original loan been paid in full on the Maturity Date.

53.     Under the terms of its renegotiated agreement, CHC is required to pay NFF in monthly installments until the balance of its debt is repaid.

## THE MECHANICS OF GUREY'S FRAUDULENT ACCOUNTING

54.     Gurey withdrew money from CHC accounts using fraudulent checks bearing forged signatures.  These fraudulent checks were never recorded in CHC's accounting system.  Instead, the withdrawals were concealed using cash transfers between two CHC bank accounts.

55.     These inter-company cash transfers were common practice at CHC and typically occurred each month for legitimate business purposes.  The transfers to and from each account were recorded net of the fraudulent checks that Gurey had written.  This process allowed the cash in CHC's accounting system to reconcile with CHC's bank statements.

56.     Although the reported cash in CHC's accounting system matched its bank statements, the system did not account for the funds that were missing as a result of the

unauthorized disbursements. In order to bring all of the accounts in CHC's accounting system into balance, Gurey falsified journal entries to other accounts, including deferred revenue and revenue, as offsetting entries to the fraudulent check amounts. This made it appear as if CHC was recognizing previously deferred revenue in the amount of each unauthorized disbursement.

## COUNT ONE
## BREACH OF FIDUCIARY DUTY

57. The allegations of the preceding paragraphs are incorporated herein as if fully set forth.

58. As CHC's Director of Finance, Gurey was in a position of trust and confidence with respect to the handling of funds held in CHC's Bank of America accounts, and CHC allowed Gurey access to and control over its accounts strictly for legitimate, business-related purposes.

59. In this capacity, Gurey owed CHC a fiduciary duty to act in good faith and with loyalty as to the management of the funds held in those accounts.

60. Gurey's fiduciary duties encompassed, among other things, a duty to use the funds in CHC's accounts strictly for the benefit of CHC's charitable mission.

61. Gurey breached his fiduciary duties to CHC when he made unauthorized withdrawals from CHC's accounts solely for the benefit of himself.

62. As a direct and proximate cause of such breach, CHC has incurred financial loss in excess of $1,100,000.

## COUNT TWO
## CONVERSION

63. The allegations of the preceding paragraphs are incorporated herein as if fully set forth.

64. CHC has a right to access and use the funds in its Bank of America accounts for the purpose of fulfilling its charitable mission.

65. Gurey exercised unlawful control over the funds in CHC's accounts when he made unauthorized disbursements from CHC's accounts to himself.

66. Gurey's intentional interference with the property rights of CHC has resulted in CHC's inability to use these funds to advance its charitable mission.

67. As a direct and proximate cause of Gurey's unlawful control over the funds in CHC's accounts, CHC has incurred financial loss in excess of $1,100,000.

## COUNT THREE
## FRAUD

68. The allegations of the preceding paragraphs are incorporated herein as if fully set forth.

69. As Director of Finance, Gurey was responsible for providing accurate financial statements to the Executive Director on a monthly and quarterly basis. CHC would then use this information to allocate funds to advance its charitable mission.

70. Instead, from 2010 to 2016, Gurey routinely presented inaccurate financial statements to CHC staff and members of the Board.

71. Gurey knew that the financial statements he prepared did not accurately reflect the amount of cash in CHC's accounts.

72. Gurey presented inaccurate financial statements to CHC employees and the Board with the intention that they would rely on his inaccurate financial reports and not detect the fraudulent aspects of his bookkeeping.

73. CHC and the Board relied on the falsified information that Gurey provided when making decisions related to the organization's budget and spending priorities.

74. As a direct and proximate result of such wrongful conduct, CHC has suffered financial loss in excess of $1,100,000.

## PRAYER FOR RELIEF

WHEREFORE, CHC prays for an entry of judgment against Gurey for actual damages, and for such other relief as this Court deems appropriate.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), CHC demands a trial by jury of all the claims asserted in this Complaint so triable.

Dated: November 8, 2017

By:    /s/   Gordon D. Todd
GORDON D. TODD (D.C. Bar # 475203)
gtodd@sidley.com
STEWART A. INMAN (D.C. Bar # 1034281)
sinman@sidley.com

SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

*Attorneys for Plaintiff*
*Congressional Hunger Center*