UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CONGRESSIONAL HUNGER CENTER, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 17-cv-02356 (APM) |
| MOHAMED H. GUREY, | ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

Before the court is Plaintiff Congressional Hunger Center's Motion for Default Judgment against its former employee, Defendant Mohamed H. Gurey. Plaintiff brought this suit after discovering what it alleges was Defendant's years-long embezzlement scheme. Defendant was properly served but failed to respond to Plaintiff's three-count complaint. In response, Plaintiff obtained an entry of default and filed this Motion for Default Judgment, seeking damages in the amount of $1,202,334.00. *See* Clerk's Entry of Default as to Mohamed H. Gurey, Dec. 8, 2017; Mot. for Default J., ECF No. 10. The court now enters judgment in favor of Plaintiff.

### I. BACKGROUND

#### A. Factual History

Defendant Mohamed H. Gurey worked for Plaintiff Congressional Hunger Center for 15 years, most recently as Plaintiff's Director of Finance. Compl. ¶ 4. His job duties included preparing Plaintiff's financial statements, monitoring payroll, preparing records for Plaintiff's annual audits, and overseeing Plaintiff's cash disbursements. *Id*. ¶¶ 15–16. In addition, Defendant

gave information to Plaintiff's executive director about the organization's finances, which, in turn, were used by Plaintiff's Board of Directors. *Id*. ¶ 17.

After an organizational restructuring in 2012, Plaintiff's executive director was responsible for supervising Defendant. *See id*. ¶¶ 18–19. Beginning in September 2015, that position was held by Shannon Maynard. *Id*. ¶ 19. Soon after the start of her tenure, Maynard slimmed the organization's budget, including by eliminating the position of Payroll & Benefits Coordinator and outsourcing financial duties to an outside vendor. *Id*. ¶¶ 20–21. Defendant "vocally opposed" the outsourcing of Plaintiff's payroll operations and offered to perform those tasks himself. *See id*. ¶ 22. Maynard agreed to assign these tasks to Plaintiff. *Id*. ¶ 22.

Maynard took leave from work from June 2016 to September 2016, during which time Defendant was supervised by Plaintiff's Chief Operating Officer, Kristin Anderson. *Id*. ¶ 23. When Maynard returned, she noticed problems with Defendant's work, including that he was failing to meet deadlines and had multiple, unexplained absences. *Id*. ¶ 24. When she met with Defendant on November 2, 2016, to discuss the organization's upcoming audit, Defendant told Maynard that he had not yet completed the necessary reports. *Id*. ¶ 26. After learning this, Maynard pushed back the audit to the second week of December. *Id*. ¶ 27.

At this same meeting, Defendant asked Maynard for 17 days of paid time off during the month of November—time off, he said, that he needed in order to complete courses that would allow him to maintain his Certified Public Accountant license. *Id*. ¶ 26. Maynard refused his request, explaining that the time off was too close to the audit and because Defendant had not given advance notice. *See id*. ¶ 28. Undeterred, Defendant called the Treasurer of the Board of Directors, Wolfgang von Maack, and asked permission to take leave. *Id*. ¶ 29. Plaintiff did not receive approval for his request. *Id*.

About a week after Maynard's meeting with Defendant, on November 10, 2016, she met with Defendant for his annual performance review, in which she gave Defendant a critical evaluation. *Id*. ¶ 30. In the review, Maynard identified as areas of improvement the timeliness of Defendant's quarterly and monthly financial reports. *Id*. On November 14, 2016, Maynard gave Defendant a "Warning and Performance Improvement Plan," which reflected those deficiencies and contained a list of key tasks to be performed. *Id*. ¶ 31.

Defendant failed to show up for work on December 7, 2016. *Id*. ¶ 32. Later that day, Maynard found in her company mailbox a letter from Defendant in which he "requested" vacation time from December 7 to December 15. *Id*. ¶ 33. In the letter, Defendant said he planned to return on December 16 to assist with the audit. *Id*. Maynard decided to fire Defendant for taking leave without permission. *Id*. ¶ 34.

Plaintiff discovered Defendant's theft of organization funds when cutting off Defendant's access to its bank accounts. *See id*. ¶ 36. When Maynard logged into the accounts to deactivate Defendant, she discovered that the balances were "dramatically lower" than that reported on a financial statement Defendant had prepared. *Id*. Per Defendant's report to Maynard, Plaintiff, as of November 23, 2016, had $715,252 on hand. *Id*. In actuality, the accounts contained only $137,526—not even enough money to cover the organization's expenses for December. *Id*.

The discovery spurred a review of Plaintiff's financial records. When reviewing the organization's transactions in 2015 and 2016, Maynard discovered "a number of suspicious checks," made out to Defendant, of amounts of more than $1,000. *Id*. ¶ 37. At the time, the Plaintiff's accounting policies required that any check for more than $1,000 be signed by two members of the organization, either Anderson and Defendant or Anderson and Maynard. *Id*. ¶ 38. The checks to Defendant all bore Defendant's signature and Anderson's signature. *Id*. ¶ 39.

Anderson's signature, however, was determined to be forged. *Id.* The checks were dated on days when Anderson was on leave, and Anderson confirmed that she had not signed them. *Id*. ¶¶ 40–41. In an investigation that followed, Plaintiff discovered Defendant had been writing unauthorized checks to himself since 2010 by forging the signature of other organization signatories. *Id*. ¶ 46.

Ultimately, Plaintiff's investigation revealed that Defendant had stolen more than $1,100,000 from the organization. *Id.* In addition to forging checks, Defendant also had made repeated withdrawals of organization funds at a Maryland casino, using his company debit card. *See id*. ¶¶ 42–43. To cover his tracks, Defendant falsified entries in documents and failed to record transactions. *See id*. ¶¶ 54, 56. Defendant's theft also jeopardized Plaintiff's financial standing with lenders. The organization was unable to repay a line of credit it had previously opened by the maturity date of February 1, 2017. *Id*. ¶ 49–53. To avoid default, Defendant had to renegotiate the terms of the line of credit, resulting in additional costs to Plaintiff. *Id*. ¶¶ 48–53.

### B. Procedural History

This action followed. On November 8, 2017, Plaintiff filed a three-count complaint against Defendant alleging: (1) breach of fiduciary duty; (2) conversion; and (3) fraud. *Id*. ¶¶ 57–74. Plaintiff claimed that it had lost more than $1.1 million as a result of Defendant's actions. *Id*. ¶¶ 62, 67, 74. Plaintiff served Defendant with the Complaint on November 14, 2017, but he never filed a responsive pleading. *See* Return of Service/Affidavit of Summons & Complaint Executed, ECF No. 4; *see also* Fed. R. Civ. P. 12(a)(1)(A)(i). In turn, Plaintiff sought and received from the Clerk of the Court an entry of default against Defendant. *See* Clerk's Entry of Default, ECF No. 8.

On January 19, 2018, Plaintiff filed the Motion for Default Judgment that is now before the court. *See* Pl.'s Mot. for Default J., ECF No. 10. Defendant has not responded to the Motion.

4

## II. LEGAL STANDARD

Rule 55 of the Federal Rules of Civil Procedure sets forth the two-step process by which a party can secure a default judgment. *See* Fed. R. Civ. P. 55(a). First, the plaintiff must ask the Clerk of the Court to enter a default against a party who has "failed to plead or otherwise defend" itself against the action. Fed. R. Civ. P. 55(a). After the entry of default has been entered on the docket, the plaintiff must move for an entry of default judgment. Fed. R. Civ. P. 55(b). District courts have discretion to enter a default judgment upon a party's motion. *See* Fed. R. Civ. P. 55(b)(2). Such motions may be granted "only when the adversary process has been halted because of an essentially unresponsive party." *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011) (quoting *Jackson v. Beech*, 636 F.2d 831, 835 (D.C. Cir. 1980)). A default judgment establishes the defendant's liability for every well-pleaded allegation in the complaint. *Carpenters Labor-Mgmt. Pension Fund v. Freeman-Carder LLC*, 498 F. Supp. 2d 237, 240 (D.D.C. 2007); *cf. Carazani v. Zegarra*, 972 F. Supp. 2d 1, 12, 15 (D.D.C. 2013). "Even after default, however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law." 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2688.1 (4th ed.).

If the court determines that a defendant is liable, it then proceeds to the damages phase. The finding of defendant's liability cannot by itself establish liability for the amount of damages claimed by the plaintiff. *See Carpenters Labor-Mgmt. Pension Fund*, 498 F. Supp. 2d at 240. Rather, the Court "must make an independent determination of the sum to be awarded," "unless the amount of damages is certain." *Serv. Emps. Int'l Union Nat. Indus. Pension Fund v. Liberty House Nursing Home of Jersey City, Inc.*, 232 F. Supp. 3d 69, 75 (D.D.C. 2017) (citation omitted). In doing so, the court may hold a hearing or may rely on affidavits and documentary evidence

submitted by the plaintiff. *Bricklayers & Trowel Trades Int'l Pension Fund v. KAFKA Constr., Inc.*, 273 F. Supp. 3d 177, 179 (D.D.C. 2017); *see also* Fed. R. Civ. P. 55(b)(2)(B).

## III. DISCUSSION

### A. Whether an Entry of Default Judgment is Appropriate

The court begins with examining whether Defendant is liable to Plaintiff and, thus, whether an entry of default judgment is appropriate.[1] For the reasons that follow, the Court finds that the facts alleged in Plaintiff's Complaint, when taken as true, sufficiently support Plaintiff's claims. Plaintiff therefore is entitled to a default judgment.

#### 1. *Breach of Fiduciary Duty*

Plaintiff's first claim alleges that Defendant breached the fiduciary duty he owed to his employer, Plaintiff. To state a claim for breach of fiduciary duty under District of Columbia law, a plaintiff "must allege facts sufficient to show (1) the existence of a fiduciary relationship; (2) a breach of the duties associated with the fiduciary relationship; and (3) injuries that were proximately caused by the breach of the fiduciary duties." *Kemp v. Eiland*, 139 F. Supp. 3d 329, 343 (D.D.C. 2015) (internal citation omitted). The definition of a "fiduciary relationship" is flexible, allowing for the inclusion of "circumstances in which a special relationship of trust may properly be implied." *Cordoba Initiative Corp. v. Deak*, 900 F. Supp. 2d 42, 50 (D.D.C. 2012) (internal citation omitted).

Based on the uncontested facts, Plaintiff has established that Defendant breached his fiduciary duty to his employer when he withdrew funds from the organization's accounts, without authorization, for his personal use. As Plaintiff's Director of Finance, Defendant owed a fiduciary

---

[1] The court has assured itself that it has subject-matter jurisdiction over the action pursuant to 28 U.S.C. § 1332(a)(1), and that venue is proper under 28 U.S.C. § 1391(b)(2). *See James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).

duty to Plaintiff. *See Cahn v. Antioch Univ.*, 482 A.2d 120, 131–32 (D.C. 1984) (explaining the fiduciary duty implied in employer-employee relationships). Defendant breached his obligations to act with the "utmost good, faith, loyalty, and honesty toward . . . his employer" by writing to himself unauthorized checks from Plaintiff's accounts, forging Anderson's and others' signatures on those checks, and making other illegitimate withdrawals of Plaintiff's money using his organization debit card. *Cahn*, 424 A.2d at 131–32 (quoting Restatement (Second) of Agency § 1 (1958)); *see* Compl. ¶¶ 37–38, 41–42, 59. In doing so, Plaintiff incurred financial loss. Compl. ¶ 62. Accordingly, Defendant is liable to Plaintiff for breach of fiduciary duty.

2. *Conversion*

In addition, Defendant is liable to Plaintiff for conversion of its property. Under District of Columbia law, conversion is "an unlawful exercise of ownership, dominion and control over the personality of another in denial or repudiation of his right to such property." *Dukore v. District of Columbia*, 970 F. Supp. 2d 23, 34 (D.D.C. 2013) (quoting *Blanken v. Harris, Upham & Co., Inc.*, 359 A. 2d 281, 283 (D.C. 1976)). A defendant is liable for conversion if the plaintiff shows that he "participated in (1) an unlawful exercise, (2) of ownership, dominion, or control, (3) over the personal property of another, (4) in denial or repudiation of that person's rights thereto." *Gov't of Rwanda v. Rwanda Working Grp.*, 227 F. Supp. 2d 45, 62 (D.D.C. 2002). Each of these elements is satisfied here. By withdrawing funds without consent and writing unauthorized checks to himself, Defendant unlawfully exercised control over Plaintiff's funds. *See* Compl. ¶¶ 42, 51, 54. In doing so, he denied Plaintiff the right to its own money. *See id*. ¶¶ 46–47, 51. He therefore converted Plaintiff's property.

3. *Fraud*

Defendant also is liable to Plaintiff for fraud. Under District of Columbia law, a plaintiff alleging a claim of fraud "must allege facts showing that a person or entity (1) made a false representation of or willfully omitted a material fact; (2) had knowledge of the misrepresentation or willful omission; (3) intended to induce another to rely on the misrepresentation or willful omission; (4) the other person acted in reliance on that misrepresentation or willful omission; and (5) suffered damages as a result of that reliance." *Jericho Baptist Church Ministries, Inc. (District of Columbia) v. Jericho Baptist Church Ministries, Inc. (Maryland)*, 23 F. Supp. 3d 1, 9–10 (D.D.C. 2016) (citation and punctuation omitted). "A false representation may be either 'an affirmative misrepresentation or a failure to disclose a material fact when a duty to disclose that fact has arisen.'" *Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 195 (D.D.C. 2016) (quoting *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1130 (D.C. 2015)).

Here, Defendant affirmatively presented the Board and his superiors with inaccurate financial statements which falsely showed that the organization had more money in the bank than the actual, lesser amount that it had. Compl. ¶¶ 17, 36, 54–56. Defendant was aware that his reports were inaccurate because they did not reflect the money he had transferred out of Plaintiff's accounts via checks and withdrawals. *Id*. ¶ 71; *see also id*. ¶¶ 14–17, 36, 54, 56. Defendant falsified these reports in order to conceal his unauthorized actions. *See id*. ¶¶ 72. The Board and Plaintiff's superiors relied on Defendant's inaccurate financial reports when making decisions about the organization's budget and expenditures. *Id*. ¶ 73. Accordingly, the facts alleged, taken as true, establish that Defendant defrauded Plaintiff of its money and property.

## B. Whether Plaintiff is Entitled to the Amount of Damages Requested

That leaves the determination of damages. Plaintiff claims that it suffered $1,202,334.00 in losses as a result of Defendant's wrongful actions—the forging of organization checks and the use of the organization's debit card to make unauthorized ATM withdrawals. Pl.'s Mem. at 8–9. To support its damages claim, Plaintiff provides declarations from Anderson and Maynard; copies of Plaintiff's monthly bank statements between August and December 2016; and copies of the cancelled checks that Defendant forged. *See* Pl.'s Mot., Attach. 1, ECF No. 10-2 [hereinafter Anderson Decl.]; Pl.'s Mot., Attach. 2, ECF No. 10-3 [hereinafter Maynard Decl.]; Maynard Decl., Ex. 2, ECF No. 10-5 [hereinafter Pl.'s Checks]; Maynard Decl., Ex. 3, ECF No. 10-6 [hereinafter Pl.'s Bank Statements].

The declarations and attachments substantiate Plaintiff's claimed losses. First, Maynard identifies 98 cancelled checks, totaling $1,050,489.80, as the checks that Defendant wrote to himself, without authorization. *See* Maynard Decl. at 4–9; Pl.'s Checks. Anderson states that 58 of the checks contain her forged signature, *see* Anderson Decl. at 3–6; the other 40 checks contain the forged signatures of two former employees who were check signatories for the organization, *see* Maynard Decl. at 3–4; *see also* Pl.'s Checks. Copies of these checks corroborate Maynard's and Anderson's statements. *See* Pl.'s Checks. In addition, Maynard identifies 36 different transactions involving the use of Plaintiff's organization debit card, totaling $151,844.04, which she states were unauthorized. Maynard Decl. at 9–11. Plaintiff's monthly bank statements reflect those transactions, all of which took place between August and December 2016. *See* Pl.'s Bank Statements. Thus, the court is satisfied that Plaintiff has proven its claimed damages of $1,202,334.00 "to a reasonable certainty." *Boland*, 763 F. Supp. 2d at 68.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Default Judgment, ECF No. 10, is granted. The court finds that Plaintiff is entitled to $1,202,334.00 in damages, plus post-judgment interest as applicable under 28 U.S.C. § 1961, from Defendant. A separate Order accompanies this Memorandum Opinion.

Dated: April 5, 2018

Amit P. Mehta
United States District Judge